## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jan 10 2018, 8:51 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Holly L. Lyons
Greenfield, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Termination of the Parent-Child Relationship of S.D. (Minor Child) | January 10, 2018 |
| and | Court of Appeals Case No. 30A01-1706-JT-1433 |
| D.D. (Mother) and G.D. (Father), | Appeal from the Hancock Superior Court |
| *Appellants-Respondents,* | The Honorable Terry K. Snow, Judge |
| v. | Trial Court Cause No. 30D01-1612-JT-452 |
| Indiana Department of Child Services, | |
| *Appellee-Petitioner.* | |

**Bradford, Judge.**

# Case Summary

[1] Appellants-Respondents D.D. ("Mother") and G.D. ("Father") (collectively, "Parents") appeal the juvenile court's order terminating their parental rights to S.D. (the "Child"). The Child was removed from Parents care because of ongoing concerns ability the family's stability. The Child was subsequently determined to be a child in need of services ("CHINS") and Parents were ordered to complete certain services. Parents, however, failed to successfully complete the court-ordered services.

[2] Appellee-Petitioner the Indiana Department of Child Services ("DCS") filed a petition seeking the termination of Parents' parental rights to the Child on December 12, 2016. Following an evidentiary hearing, the juvenile court issued an order granting DCS's petition. On appeal, Parents contend that DCS did not provide sufficient evidence to support the termination of their parental rights. Parents also contend that the juvenile court erred in admitting and considering certain exhibits offered by DCS. We affirm.

# Facts and Procedural History

[3] Father and Mother are the parents of the Child, who was born on December 19, 2003. Mother has been responsible for the care of the Child since the Child's birth. Father has never been responsible for the care of the Child.

[4] DCS has a lengthy history with the family. In relation to the Child, DCS filed a CHINS petition on January 18, 2005, alleging that the Child's "physical or mental health [was] seriously endangered due to injury by the act or omission of his parent, guardian[,] or custodian." Tr. Vol. IV, p. 193. This case was closed on August 10, 2005.

[5] On October 26, 2007, DCS filed a second CHINS petition in relation to the Child. This petition was based on allegations that Mother's friend was sexually abusing the then-three-year-old Child and that Mother was permitting the perpetrator to have continued contact with the Child "even after she knew that an inappropriate sexual act had occurred between the alleged perpetrator and her son." Tr. Vol. IV, p. 166. The Child was adjudicated a CHINS on November 5, 2007. The case was subsequently closed on March 14, 2008.

[6] DCS filed a third CHINS petition in relation to the Child on May 1, 2009. This petition alleged concerns about whether Mother could adequately care for the Child after the Child took five pills intended to treat a seizure disorder at one time. The Child was hospitalized due to the severity of his symptoms after taking the pills. The Child was adjudicated a CHINS on June 10, 2009. He was subsequently returned to Mother's care and the CHINS case was closed on May 20, 2011.

[7] On November 19, 2013, DCS filed a petition seeking an informal adjustment. The juvenile court granted DCS's petition the same day. DCS filed a second petition seeking an informal adjustment on November 7, 20104. The juvenile

court granted this second petition on November 11, 2014. DCS filed a third petition seeking an informal adjustment on January 7, 2015. The juvenile court granted DCS's petition on January 8, 2015. The third petition alleged that the Child was suffering from neglect. It also alleged that Mother "has a traumatic brain injury that impacts her cognitive functioning, making it difficult to meet the [C]hild's needs on a daily basis and community support is often needed to assist the family." Appellants' App. Vol. II, p. 56.

[8] On May 12, 2015, due to ongoing instability, DCS filed a CHINS petition and removed the Child from Mother's care. The juvenile court subsequently adjudicated the Child to be a CHINS, finding that Parents "manifest cognitive delays that will continue to impede their abilities to fulfill parental obligations to the [C]hild." Appellants' App. Vol. II, p. 34. During the CHINS proceedings, Mother received services aimed at helping Mother obtain stable housing and assisting her with management of her finances and basic life skills. Mother also received services aimed at engaging her in a domestic violence assessment given her history of domestic violence with multiple partners. In January of 2016, the juvenile court found that Mother was unable to successfully complete these services and Father, who resided in an assisted living facility, was unable to care for the Child.

[9] On December 12, 2016, DCS filed a petition seeking the termination of Parents' parental rights to the Child. The juvenile court conducted a two-day evidentiary hearing on DCS's petition on May 22 and 23, 2017. During the evidentiary hearing, DCS presented evidence indicating that Mother continued

to struggle with stability and that neither Mother nor Father were able to provide adequate care for the Child. Following the conclusion of the hearing, the juvenile court took the matter under advisement. On June 9, 2017, the juvenile court issued an order terminating Parents' parental rights to the Child. This appeal follows.

# Discussion and Decision

[10] On appeal, Parents challenge the juvenile court's order terminating their parental rights to the Child. The Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise his or her child. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further, we acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id*. However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet his or her responsibility as a parent. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Therefore, parental rights are not absolute and must be subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Id*.

[11] The purpose of terminating parental rights is not to punish the parent but to protect the child. *Id*. Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id*. The juvenile court need not wait until the child is irreversibly harmed such that his physical, mental,

and social development is permanently impaired before terminating the parent-child relationship. *Id.*

# I. Sufficiency of the Evidence

Parents contend that the evidence presented at the evidentiary hearing was insufficient to support the juvenile court's order terminating their parental rights to the Child. In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Involuntary Termination of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.* Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id.* First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id.*

In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent-child relationship only if they are clearly erroneous. *Id.* A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id.* A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id.*

In order to involuntarily terminate a parent's parental rights, DCS must establish by clear and convincing evidence that:

> (A) one (1) of the following is true:
>> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>> (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
>> (iii) The child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
> (B) that one (1) of the following is true:
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
> (C) termination is in the best interests of the child; and
> (D) there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).

[15]  Parents do not dispute that DCS presented sufficient evidence to support the first, third, and fourth elements set forth in Indiana Code section 31-35-2-4(b)(2). Parents claim, however, that DCS failed to establish the second element that is required to be proven before a court can order the involuntary termination of a parent's parental rights.

## A. Whether Conditions Will Be Remedied

[16]  On appeal, Parents argue that DCS failed to establish by clear and convincing evidence both that the conditions leading to the Child's removal from Mother's home would not be remedied and that there is a reasonable probability that the continuation of the parent-child poses a threat to the well-being of the Child. It is well-settled that because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the juvenile court need only find either that (1) the conditions resulting in removal from or continued placement outside the parent's home will not be remedied, (2) the continuation of the parent-child relationship poses a threat to the child, or (3) the child has been adjudicated CHINS on two separate occasions. *See In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003), *trans. denied*. Therefore, where the juvenile court determines one of the above-mentioned factors has been proven and there is sufficient evidence in the record supporting the juvenile court's determination, it is not necessary for DCS to prove, or for the juvenile court to find, either of the other two factors listed in

Indiana Code section 31-34-2-4(b)(2)(B).[1] *See generally In re S.P.H.*, 806 N.E.2d at 882 (providing that because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, DCS need only prove and the juvenile court need only find that one of the factors listed in that sub-section is true).

[17] In order to determine whether the conditions will be remedied, the juvenile court should first determine what conditions led DCS to place the Child outside of his parent's care or to continue the Child's placement outside parent's care, and, second, whether there is a reasonable probability that those conditions will be remedied. *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*; *In re S.P.H.*, 806 N.E.2d at 882. When assessing whether a reasonable probability exists that the conditions justifying the child's removal or continued placement outside his parent's care will not be remedied, the juvenile court must judge the parent's fitness to care for the child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re A.N.J.*, 690 N.E.2d 716, 721 (Ind. Ct. App. 1997). The juvenile court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id*. A juvenile court may properly consider evidence of the parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate employment and housing. *McBride v. Monroe Cnty. Office of Family &*

---

[1] While the record makes clear that the Child was previously adjudicated to be a CHINS on two prior occasions, the trial court did not rely on this fact in terminating Parents' parental rights to the Child. As such, we will not rely on this fact on appeal.

*Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Moreover, a juvenile court "'can reasonably consider the services offered by [DCS] to the parent and the parent's response to those services.'" *Id.* (quoting *In re A.C.C.*, 682 N.E.2d 542, 544 (Ind. Ct. App. 1997)). The evidence presented by DCS "need not rule out all possibilities of change; rather, DCS need establish only that there is a reasonable probability that the parent's behavior will not change." *In re Involuntary Termination of Parent-Child Relationship of Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

[18] The juvenile court determined that DCS presented sufficient evidence to prove that it was unlikely that the reasons for the Child's removal from and continued placement outside Parents' care would be remedied, and upon review, we conclude that the juvenile court's determination to this effect is supported by the record. In support of its determination, the juvenile court found as follows:

> 15.) The Court finds the following facts and inference from the testimony of John Mullany, who testified at the termination trial session conducted on 5/22/2017:
>> a) The witness is the DCS Family Case Manager (hereinafter, "FCM") who has overseen the CHINS and termination cases for the [C]hild;
>> ****
>> c) Mother has been offered homebased therapy to address anger, emotional awareness, and stability;
>> d) Mother has been offered homebased casework to address housing, stability, and transportation;
>> e) Mother has been offered a domestic violence assessment which recommended [M]other participate in victim's services. Mother went to a few classes before she quit participating in this service;

f) Despite the efforts by the Department and the contracted service providers to assist the parents in their ability to provide for the [C]hild, [M]other and [F]ather have been unable to improve in their ability to provide for the [C]hild.  Mother is no more stable as of the date of this hearing as she was at the time of the [C]hild's removal from the home.  Father suffers from significant mental and physical health diagnoses which prevent him from making any improvements in his ability to care for the [C]hild, despite the services he has received from Gallahue.

g) FCM visited [F]ather's and [M]other's residence as recently as 10 days prior to the hearing, and the home did not meet minimum standards for suitability for the [C]hild.  There were multiple weapons found in the home, including hunting knives and a bow and arrows.  There was alcohol out and accessible in the home.  The home was infested with gnats and fruit flies.  There was molded food on the counters.  The bathroom was inaccessible and items had to be moved in order for FCM to gain access to inspect the bathroom.  There were two pets in the home, a puppy and a cat.  There was feces and urine all over the floor.  There was evidence that [J.D.] was also residing in the home with [M]other and [F]ather….

i) Mother has moved at least fifteen times during the duration of this CHINS matter.  All of the residences where she has resided have had safety concerns.  The concerns include domestic violence, drug use, and criminal behavior;

**\*\*\*\***

17.) The Court finds the following facts and inferences from the testimony of Amanda Plummer, who testified at the termination trial session conducted on 5/22/2017;

a) The witness is [F]ather's Gallahue service provider.  She coordinates [F]ather's services.  Father

receives extensive services through Gallahue due to his disabilities....

c) Despite [F]ather's treatment, there is nothing that could be offered that would assist in his ability to parent the [C]hild;

d) Father is incapable of providing his own care, and will not be able to provide for the care of the [C]hild; He has never had care or custody of this [C]hild.

e) Father has allowed [M]other and [J.D.] to live in the home with him;

f) The conditions of the home are unacceptable, with multiple health and safety concerns;

****

18.) The Court finds the following facts and inferences from the testimony of James Rowe, who testified at the termination trial session conducted on 5/22/2017:

a) The witness was the homebased case worker for the [M]other and [C]hild, provided visit supervision, as well as homebased case management and life skills for [M]other and [C]hild;

b) Mother has met with the provider, but has not met her treatment goal of stability;

c) Mother continues to move and has made no improvements in her ability to providing housing and structure for the [C]hild;

****

19.) The Court finds the following facts and inferences from the testimony of Jim Polly, who testified at the termination trial session conducted on 5/22/2017:

a) The witness was the homebased therapist for the [M]other and [C]hild. He has worked with [M]other for the last five years;

b) Mother's treatment goals were stability and anger management;

c) Mother has made no progress toward her treatment goals;

****

e) Mother has not made progress in the last five years, and is unlikely to progress in the next five years, at which time the [C]hild will be an adult;

****

20.) The Court finds the following facts and inferences from the testimony of Stephen Ellis, who testified at the termination trial session conducted on 5/22/2017:

a) The witness is the Court Appointed Special Advocate (hereinafter, "CASA") appointed for the [C]hild in this case;

b) The [P]arents have not been able to make improvements in their ability to care for the [C]hild, despite the efforts of the Department and community resources;

****

d) Father does not have the capacity to fulfill his parental responsibilities;

e) Mother does not have the capacity to fulfill her parental responsibilities;

****

24.) The extensive facts and inferences that have been found above lead to the following more categorical findings of fact now set forth:

a) The [C]hild's [M]other has failed to achieve or sustain any period of stability for herself or the [C]hild since well before the opening of the related CHINS proceedings in this county for the [C]hild, and including the period of approximately 2 years of the CHINS case itself;

b) Mother has moved and/or been evicted from her home at least fifteen (15) times since the inception of this case, many of which moves would have resulted in a [C]hild's change in school. Despite the theoretical ability to enroll a child in a school district different from the child's neighborhood school, [P]arents have no transportation or ability to get the [C]hild to school if that were to be the case;

c)  The [C]hild's mother has compounded her fundamental parental deficiency by engaging in instances of domestic violence with her older son and her boyfriends, living with drug users and residing in places that have no working utilities and other problems;

d)  The [M]other has demonstrated on multiple occasions that she has the lifestyle of a transient.  The example that she has set is apparent in the known conduct of this [C]hild's older sibling, who continues criminal behaviors, drug use, and violence.  The [C]hild's [M]other has not provided any other recognizable pattern to follow to this [C]hild;

****

g)  The [C]hild's [M]other and [F]ather have failed to benefit from multiple ordered reunification services, indicating their inability to make improvements in their ability to care for the [C]hild despite multiple referrals for services by DCS and community based partners.  The family did attend services, but their cognitive limitations and life styles have prevented them from meeting treatment goals and they remain unable to care for the [C]hild[.]

Appellants' App. Vol. II, p. 22–29 (some bold removed).  In light of these findings, the juvenile court concluded that DCS had established by clear and convincing evidence that the reasons for the Child's removal from and continued placement outside Parents' home would not be remedied.

[19]   We note that in claiming that the evidence was insufficient to support the juvenile court's order terminating their parental rights, Parents do not challenge the sufficiency of any particular finding, instead levying only the blanket assertion that the juvenile court's conclusion was not supported by the

evidence. As a result, Parents have waived any argument relating to whether these unchallenged findings are clearly erroneous. *See Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992) (providing that when an appealing party fails to challenge the findings of the trial court, the findings must be accepted as correct); *In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (providing that failure to challenges findings resulted in waiver of argument that findings were clearly erroneous), *trans. denied*.

[20] On appeal, Parents argue that there was no evidence that the Child ever went without shelter; was ever deprived of food, clothing, or medical care; endangered by Mother's frequent moves; endangered by the continued presence of his older brother; or deprived of an education. Parents also argue that they participated in the services offered by DCS. Parents assert that despite DCS's claims, the Child "had shelter, was getting his education, and his needs were generally being lovingly met by his parents." Appellants' Br. p. 7.

[21] We must disagree with Parents' assertion that the Child's needs were being adequately met. Further, it is well-established that the juvenile court, acting as a trier of fact, was not required to believe or assess the same weight to the testimony as Parents. *See Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004); *Marshall v. State*, 621 N.E.2d 308, 320 (Ind. 1993); *Nelson v. State*, 525 N.E.2d 296, 297 (Ind. 1988); *A.S.C. Corp. v. First Nat'l Bank of Elwood*, 241 Ind. 19, 25, 167 N.E.2d 460, 463 (1960); *Haynes v. Brown*, 120 Ind. App. 184, 189, 88 N.E.2d 795, 797 (1949), *trans. denied*. Parents' challenges to the sufficiency of the evidence to support the conclusions of the juvenile court effectively amount

to invitations for this court to reassess witness credibility and reweigh the evidence, which, again, we will not do. *See In re S.P.H.*, 806 N.E.2d at 879.

[22] Upon review, we conclude that the above-quoted facts demonstrate that Mother has ongoing stability issues and that neither Mother nor Father are in a position where they can provide adequate care for the Child. As such, we further conclude that the juvenile court did not err in determining that the conditions leading to the Child's removal from and continued placement outside's her parents' care were unlikely to be remedied. Having concluded that the evidence was sufficient to support the juvenile court's determination, and finding no error by the juvenile court, we need not consider whether the continuation of the parent-child relationship poses a threat to the Child's well-being because DCS has satisfied the requirements of Indiana Code section 31-35-2-4(b)(2)(B) by clear and convincing evidence.

## II. Admission of Evidence

[23] Parents also argue that their due process rights were violated by the admission of certain DCS records as evidence during termination hearing. Specifically, Parents assert the following:

> A considerable portion of the evidence presented by DCS to support their position regarding termination was done via self-admitting exhibits tendered without a live witness. Mother and Father were left with no real opportunity for cross examination of the documents and there was not a clear record of what the background/basis was for the termination. These same exhibits were relied on heavily by the court in the Findings of Fact,

Conclusions of Law, and Judgement Terminating the Parent-Child Relationship in both facts and inferences.

Appellants' Br. p. 8.

[24] Parents do not point to any specific exhibits of which they are complaining, but rather appear to claim that the juvenile court should not have relied on any of the forty-nine exhibits offered by DCS.[2] Review of the record reveals that Exhibits one through eleven and forty-nine through fifty-one were admitted without objection. Parents, therefore, have waived any appellate challenge to these exhibits. *See In re Des.B.*, 2 N.E.3d 828, 834 (Ind. Ct. App. 2014) (providing that failure to object to the admission of evidence at trial results in waiver and precludes appellate review).

[25] As for Exhibits twelve through forty-eight, Parents objected on relevancy grounds. The trial court admitted the documents into evidence over Parents' objections, explaining that the documents could be considered as "historical background" when considering whether the conditions that led to the removal of the Child from Parents' care would likely be remedied. Tr. Vol. II, p. 10. Parents do not develop any specific argument relating to these Exhibits, instead making only the general claim that the juvenile court should not have consider these documents. Parents therefore have failed to develop any cogent argument

---

[2] A review of the record reveals that these exhibits were reports, petitions, and orders filed in connection to the underlying CHINS and termination proceedings.

regarding what specific error they believed the juvenile court committed. They have therefore waived their challenge to these documents on appeal. *See Pasha v. State*, 524 N.E.2d 310, 314 (Ind. 1988) (providing that "[b]ald assertions of error unsupported by either cogent argument or citation to authority result in waiver of any error on review.").[3]

# Conclusion

[26] Having concluded that the evidence is sufficient to support the juvenile court's order terminating Parents' parental rights to the Child and that the juvenile court did not err in admitting DCS's proffered exhibits, we affirm the judgment of the juvenile court.

[27] The judgment of the juvenile court is affirmed.

Robb, J., and Crone, J. concur.

---

[3] In addition, even if Parents had not waived their challenge to the admission of these Exhibits, we note that the Exhibits are admissible under Indiana Evidence Rule 201 as they are court records from Parents' prior child welfare cases.